**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DR. REBECCA SAGER,<br>an Oklahoma citizen,<br>AFFILIATED PATHOLOGISTS, P.A.,<br>a Texas Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>JACKSON COUNTY MEMORIAL HOSPITAL, a public trust,<br>JCMH HEALTH CARE CORPORATION,<br>a nonprofit corporation,<br>JACKSON COUNTY MEMORIAL HOSPITAL FOUNDATION, a nonprofit corporation, STEVE HARTGRAVES, an Oklahoma citizen, SHELLEY SIMMONS, an Oklahoma citizen, and AIRSAFE, LLC, a Missouri limited liability corporation<br><br>Defendants. | Case No. ___________________ |

## INTRODUCTION

This action arises from Dr. Rebecca Sager's prolonged exposure to formaldehyde while serving as Chief of Pathology at Jackson County Memorial Hospital. In February 2025, an independent inspection found that the exhaust hood in the pathology gross room failed airflow and smoke-containment testing and was "not safe for use." The hood failed again after cleaning, but JCMH continued to operate the gross room without replacing it or providing adequate respiratory protection. During the following months, environmental testing and JCMH's own monitoring documented elevated formaldehyde levels; corrected laboratory data ultimately reflected an eight-hour time-weighted average of 1.6 ppm, more than twice OSHA's permissible exposure limit. Dr.

Sager continued working in the gross room during this period and developed permanent eye injuries that now substantially impair her ability to perform gross and microscopic pathology work.

Dr. Sager repeatedly reported the ventilation and formaldehyde hazards to JCMH leadership and sought corrective action. On April 29, 2025, days after another meeting concerning the unresolved safety issues, Defendant Steve Hartgraves announced that the pathology department would be outsourced and gave notice terminating Affiliated Pathologists' service agreement. JCMH attributed the decision to financial considerations, including an asserted tripling of reagent and supply costs, but its own budget and board records do not support that explanation. Dr. Sager continued raising the safety concerns, including with outside regulators, and the dispute later escalated to accusations against her, suspension of her clinical privileges, and an accelerated termination of the pathology agreement. Plaintiffs seek recovery for the injuries caused by the formaldehyde exposure and for the retaliation that followed Dr. Sager's efforts to remediate the unsafe conditions.

## PARTIES

1. Rebecca Sager, M.D. ("Dr. Sager") is an Oklahoma citizen who resides in Jackson County, Oklahoma, and, at all relevant times, served as Chief of Pathology at Jackson County Memorial Hospital in Altus, Oklahoma.

2. Affiliated Pathologists, P.A. ("Affiliated"), is a corporation incorporated in Texas whose principal place of business is in Denton, Texas.

3. Jackson County Memorial Hospital Authority ("Authority") was created under a trust indenture dated July 1, 1981, as a public trust under the provisions of Title 60 of the Oklahoma Statutes for the benefit of Jackson County, Oklahoma.

4. Defendant Authority is a component of the County, and the Board of County Commissioners appoints the members of the Authority's Board of Trustees.

5. Defendant Authority operates Jackson County Memorial Hospital ("JCMH"), located in Altus, Oklahoma, under a bargain lease agreement with the County. The lease term is from July 1, 1981 to June 30, 2031.

6. Defendant Authority is a governmental entity is a person pursuant to 42 U.S.C. § 1983.

7. JCMH Health Care Corporation ("JCMH HCC") is a nonprofit corporation incorporated in Oklahoma with its principal place of business in Jackson County, Oklahoma.

8. Jackson County Memorial Hospital Foundation ("Foundation") is a nonprofit corporation incorporated in Oklahoma with its principal place of business in Jackson County, Oklahoma.

9. Defendants Authority, JCMH HCC, and Foundation are collectively referred to as "Hospital Defendants."

10. Steve Hartgraves ("Hartgraves") is an Oklahoma citizen who resides in Jackson County, Oklahoma. At all times material herein, Defendant Hartgraves was the President and CEO of the JCMH and was an agent and employee of JCMH with final policymaking authority.

11. Defendant Hartgraves was an employee acting under the color of state law within the scope of his authority and employment with JCMH, with supervisory duties over JCMH employees.

12. Defendant Hartgraves was responsible for the safety of JCMH and compliance with federal and state laws and regulations.

13. Defendant Hartgraves is sued in his individual capacity.

14. Defendant Shelley Simmons ("Simmons") is an Oklahoma citizen who resides in Jackson County, Oklahoma. At all times material herein, Defendant Simmons was the Chief Operating Officer ("COO") & Senior Vice President of Patient Care and was an agent and employee of JCMH with final policymaking authority.

15. Defendant Simmons was an employee acting under the color of state law within the scope of her authority and employment with JCMH, with supervisory duties over JCMH Laboratory employees.

16. Defendant Simmons is responsible for the safety of JCMH and compliance with federal and state laws and regulations.

17. Defendant Simmons is sued in her individual capacity.

18. AirSafe, LLC ("AirSafe") is a Missouri limited liability corporation with its principal place of business at 129 S. Gallatin St., Liberty, Missouri 64068.

## JURISDICTION AND VENUE

19. This action arises under the laws of the State of Oklahoma and the United States Constitution, particularly under the provisions of the First Amendment to the United States Constitution and under the Civil Rights Act, 42 U.S.C. §§ 1983, 1988.

20. This Court has federal question jurisdiction over Plaintiff's civil rights claims pursuant to 28 U.S.C. §§ 1331, 1343.

21. This Court has subject matter jurisdiction over Plaintiffs' claims against Defendant AirSafe pursuant to 28 U.S.C. § 1332(a)(1) because this suit is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

22. This Court has supplemental jurisdiction over Plaintiffs' state tort law claims pursuant to 28 U.S.C. § 1367 as they are so related to claims in this action within original jurisdiction that they form part of the same case or controversy.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) and other applicable law because a substantial part of the events or omissions giving rise to the case occurred in the Western District of Oklahoma.

24. On November 26, 2025, Dr. Sager timely presented a Notice of Oklahoma Governmental Tort Claim to the Office of the Risk Management Administrator of the Office of Management and Enterprise Services and JCMH.

25. On February 26, 2026, JCMH denied the claim.

26. More than 90 days have passed since Dr. Sager filed her GTCA claim, and it has been less than 180 days since the OGTCA investigative period expired.

## FACTS COMMON TO ALL CLAIMS

### A. Relationship between the Parties

27. On July 1, 2013, Affiliated President Kenneth L. Ford, M.D., entered into the Pathology Service Agreement (the "Agreement") with the JCMH to provide pathology services for the JCMH's benefit.

28. Affiliated designated Dr. Sager to serve as Medical Director of the JCMH's clinical laboratory.

29. On December 30, 2022, Dr. Sager purchased all shares of Affiliated Pathologists and became the President.

30. On October 17, 2023, Dr. Ford passed away.

31. At all times material herein, Dr. Sager was the Owner, President, and an employee of Affiliated.

32. At all times material herein, through the Agreement, Dr. Sager served as Chief of Pathology and the Laboratory Medical Director for the JCMH Laboratory.

33. At all times material herein, Affiliated was an independent contractor for JCMH with no supervisory responsibilities over JCMH Laboratory employees.

34. At all times material herein, Dr. Sager was not an employee of JCMH and provided pathology services at JCMH through Affiliated.

35. At all times material herein, JCMH had exclusive control and responsibility for the safety and required maintenance of JCMH, including the JCMH Laboratory.

36. At all times material herein, Sue McDowell was an employee of JCMH and served as the JCMH Laboratory Director.

37. Ms. McDowell was responsible for supervising laboratory staff.

38. At all times material herein, Dacia Binghom was an employee of JCMH and served as the JCMH Pathology Supervisor.

39. At all times material herein, Mary Jencks was an employee of JCMH and served as the JCMH Infection Prevention Coordinator.

40. At all times material herein, Dena Vineyard was a part-time employee of JCMH as a Histotechnologist in the JCMH Laboratory.

41. At all times material herein, Dalton Gunkel was an employee of JCMH and served as the JCMH Director of Plant Operations.

**B. The JCMH Laboratory**

42. The Gross Room is where surgical tissues and other biological specimens are examined and sectioned.

43. Once these specimens are selected for processing and made into microscope slides for a pathologist, such as Dr. Sager, to examine.

44. Preparing and testing such tissues and specimens required Dr. Sager and other lab employees to work with and around various toxic substances, including formaldehyde.

45. The front accessioning room ("historoom") is where specimens are received and accessioned for grossing by Histotechnicians.

46. Dr. Sager examined surgical tissue specimens in the Gross Room.

**C. The threat of formaldehyde exposure**

47. Formaldehyde is used as a chemical fixative to preserve tissue samples, biopsies, and organs for pathology and histology testing.

48. Formaldehyde is classified as a human carcinogen.

49. OSHA identifies formaldehyde as a select carcinogen under 29 C.F.R. § 1910.1048, Appendix A.

50. Formaldehyde is a recognized respiratory and dermal sensitizer.

51. Acute exposure can cause irritation of the eyes, nose, and throat.

52. Acute exposure can cause coughing, wheezing, and chest tightness.

53. Symptom severity from formaldehyde exposure increases at higher airborne concentrations.

54. Formalin is a mixture of formaldehyde gas (37% by weight/40% by volume) dissolved in water with a methanol stabilizer.

55. Formalin is used in pathology and histology laboratories, including JCMH's, as a tissue fixative for gross dissection, specimen processing, and embedding.

56. JCMH's Pathology Laboratory used 10% neutral buffered formalin, which is a 10% dilution of commercial stock formalin solution in water, which is equivalent to approximately 4% formaldehyde gas in solution.

57. OSHA's formaldehyde standard, 29 C.F.R. § 1910.1048, specifically identifies histopathology laboratory operations, including gross room and embedding work, as a covered industry segment with heightened formaldehyde exposure potential.

58. OSHA's formaldehyde standard warrants periodic monitoring of histopathology laboratory operations.

59. Accurate measurement and reporting of formaldehyde exposure levels is critical to protecting the health and safety of laboratory personnel.

60. Prompt corrective action where formaldehyde exposure limits are exceeded is critical to protecting the health and safety of laboratory personnel.

**D. Laws, Rules, Regulations, and Recommendations Designed to Prevent Formalin Exposure**

61. Formalin exposure is preventable through the installation of a properly functioning ventilation hood.

62. Formalin exposure is preventable through the use of proper personal protective equipment ("PPE").

63. An employer must ensure that no worker is exposed to an airborne concentration of formaldehyde that exceeds 0.75 parts formaldehyde per million parts of air (0.75 ppm) as an 8-hour time-weighted average.

64. 29 CFR § 1910.9 requires employers to provide PPE, including respirators and other types of PPE.

65. Oklahoma has assumed responsibility for enforcing public sector workplace safety and health standards, such that only private sector workplace safety standards in Oklahoma are subject to direct federal OSHA inspection and enforcement.

66. Oklahoma's public sector workplace safety and health program, the Public Employees Occupational Safety and Health ("PEOSH") program, is administered by the Oklahoma Department of Labor under the Oklahoma Occupational Health and Safety Standards Act, 40 O.S. §§ 401–424.

67. PEOSH incorporates all federal OSHA standards found under 29 C.F.R. §§ 1904, 1910, and 1926.

**E. Reported Safety Violations**

68. On February 26, 2025, a Laboratory and Exhaust Hood and Sound Certification report from Advanced 797 found that the exhaust hood in the pathology gross room was unsafe for use.

69. On March 12, 2025, the exhaust hood failure was formally reported to Defendant Simmons and to JCMH Corporate Compliance.

70. No corrective action had been taken between the February 26, 2025, finding and the March 12, 2025, report.

71. On March 17, 2025, Moonlight Maintenance was brought in to clean the exhaust hood.

72. The hood again failed feet-per-minute airflow ("FPM") testing on March 19, 2025.

73. The hood again failed smoke-containment testing on March 19, 2025.

74. On March 19, 2025, Defendant Simmons organized a meeting acknowledging the continuing deficiency.

75. Multiple meetings were organized by Defendant Simmons between March 28 and April 7, 2025, acknowledging numerous unresolved issues regarding pathology employee safety.

**F. Formaldehyde Vapor Monitoring**

76. On or about April 9, 2025, Defendant AirSafe's technicians placed formaldehyde, xylene, and acetic acid monitoring badges in the Histology/Pathology gross room at JCMH.

77. The badges were analyzed by Advanced Chemical Sensors ("ACS"), an accredited laboratory.

78. ACS issued a Formaldehyde Vapor Analysis Report dated May 8, 2025.

79. The May 8, 2025, report listed an exposure time as "9:00–9:23 = 0.38" hours.

80. The exposure time reported on May 8, 2025, was incorrect.

81. On May 21, 2025, Defendant AirSafe's technician John Beyers transmitted to JCMH a "Controlled Environment Performance Test and Certification Report."

82. The May 21, 2025, report was reviewed and signed by Defendant AirSafe CEO Brett Monday.

83. Defendant AirSafe's Summary and Recommendations stated that "during this period of sampling, there were no noticeable spikes of Formaldehyde, Xylene or Acetic detected."

84. Defendant AirSafe's Summary and Recommendations further stated that "[n]o individual reading exceeded the OSHA Time-Weighted Average for Formaldehyde at 0.75 ppm."

85. The OSHA permissible exposure limit ("PEL") for formaldehyde is 0.75 ppm as an 8-hour time-weighted average.

86. OSHA's "action level" of 0.5 ppm.

87. OSHA's short-term exposure limit of 2.0 ppm over 15 minutes.

88. Defendant AirSafe's report expressly acknowledges the OSHA PEL, action level, and short-term exposure limit for formaldehyde.

89. On May 21, 2025, Dena Vineyard emailed John Beyers directly questioning how a 33.4 ppm reading over a stated 0.38-hour exposure period could be reconciled with OSHA's 0.75 ppm 8-hour PEL.

90. On May 28–29, 2025, Beyers acknowledged in writing that the sample was actually a 24-hour sample.

91. Beyers acknowledged that the reported 0.38-hour exposure time was incorrect.

92. Beyers's acknowledgment came three weeks after Defendant AirSafe's certification report had already told JCMH no exceedance existed.

93. Defendant AirSafe did not furnish a corrected report for approximately three additional weeks, after Beyers's acknowledgment.

94. Dena Vineyard followed up requesting the corrected report on June 12, 2025.

95. Dena Vineyard again followed up requesting the corrected report on June 17, 2025.

96. On June 18, 2025, Beyers transmitted an updated ACS report reflecting the corrected 24.38-hour exposure period.

97. The June 18, 2025, updated report reflected a resulting concentration of 0.52 ppm, above OSHA's 0.5 ppm action level.

98. Defendant AirSafe's summary report accompanying the June 18, 2025, corrected data was not revised.

99. Defendant AirSafe's summary report continued to state that no individual reading exceeded the OSHA time-weighted average for formaldehyde.

100. On June 19–20, 2025, Dena Vineyard again asked Beyers what formula had been used to calculate the time-weighted average.

101. Dena Vineyard also asked Beyers what an "action level" meant.

102. Beyers responded that he was traveling and directed Vineyard to call ACS directly.

103. Beyers did not provide the requested calculation.

104. Beyers did not provide the 8-hour time-weighted average ("Basis 8.00") figure that Defendant AirSafe possessed or could have obtained.

105. On July 2, 2025, after Dena Vineyard independently contacted ACS directly, ACS transmitted a report including a Basis 8.00 calculation.

106. The Basis 8.00 calculation totaled 1.6 ppm, more than double OSHA's 0.75 ppm PEL.

107. Defendant AirSafe did not proactively provide the Basis 8.00 calculation to JCMH or Dr. Sager at any point.

108. Upon information and belief, after May 21, 2025, Defendant AirSafe never issued a corrected certification report reflecting that the gross room had exceeded the OSHA action level and 8-hour PEL for formaldehyde.

109. JCMH's Pathology Gross Room Air Quality Monitor Logs for April through July 2025 independently recorded formaldehyde (HCHO) readings above the OSHA PEL of 0.75 ppm on at least nineteen separate dates.

110. Those dates include April 28, May 3, May 4, May 7, May 8, May 20, May 21, May 23, May 30, June 1, June 5, June 13, June 21, July 1, July 2, July 3, July 8, July 16, and July 18, 2025.

111. During this time, Dr. Sager was exposed to excess levels of formaldehyde.

112. During this time, other JCMH employees were exposed to elevated formaldehyde levels in the gross room.

113. On July 14, 2025, the College of American Pathologists ("CAP") notified Dr. Sager, in her capacity as laboratory director, of a complaint alleging unsafe formalin levels in the JCMH laboratory.

114. CAP requested a corrective action summary from Dr. Sager.

115. In JCMH's July 16, 2025, response to CAP, COO Shelley Simmons stated that "NO further intervention required."

116. JCMH's July 16, 2025, response attached the corrected AirSafe/ACS formaldehyde report reflecting a 24-hour level of 0.52 ppm.

117. JCMH's July 16, 2025, response also attached the Basis 8.00 8-hour TWA of 1.6 ppm as purported support for that conclusion.

**G. The Gross Room Exhaust/Flow Reporting**

118. On February 26, 2025, Advanced 797 of Broken Arrow, Oklahoma performed a Laboratory and Exhaust Hood and Sound Certification on the JCMH gross room exhaust canopy.

119. Advanced 797 recorded an average face velocity of only 46 feet per minute ("fpm") on the gross room exhaust canopy.

120. The gross room exhaust canopy failed smoke containment testing on February 26, 2025.

121. Advanced 797 expressly noted that "[t]he Grossing canopy failed to contain smoke. . . The canopy is not safe for use."

122. On March 19, 2025, Advanced 797 re-inspected the same gross room exhaust hood after interim cleaning by a third-party vendor.

123. Advanced 797 again recorded a failing average velocity of 44 fpm on March 19, 2025.

124. The hood again failed smoke containment testing on March 19, 2025.

125. On or about April 9, 2025, Defendant AirSafe, through Apex Medical Gas Systems ("Apex"), issued a System Airflow report for the JCMH facility.

126. Defendant AirSafe's April 9, 2025, report represented the gross room exhaust, identified as "E3" on AirSafe's own room diagram, at 175 cubic feet per minute ("CFM") through a 9-inch diameter duct.

127. Applying the standard formula FPM = CFM ÷ duct cross-sectional area to AirSafe's reported figures implies an air velocity of approximately 396 fpm.

128. Defendant AirSafe's implied velocity of 396 fpm was nearly nine times the velocity independently and contemporaneously measured by Advanced 797 on the same hood.

129. Defendant AirSafe's April 9, 2025, report calculated the Histology room's actual air changes per hour ("ACH") at 6.21.

130. Defendant AirSafe's April 9, 2025, report represented that the Histology room met the minimum required 6 ACH standard.

131. Defendant AirSafe's April 9, 2025, report did not reconcile or address the contradictory, failing velocity and smoke-containment data independently generated by Advanced 797 on the same exhaust hood within the preceding six weeks.

132. On May 19, 2025, Defendant Simmons circulated an email to pathology staff, including Dr. Sager.

133. Defendant Simmons's May 19, 2025, email stated that a decision had been made to potentially outsource the Pathology department.

134. Defendant Simmons's May 19, 2025, email stated that this decision "directly impacts the decision NOT to replace hoods or equipment."

135. Upon information and belief, Defendant AirSafe's April 9, 2025, System Airflow report, was inconsistent with contemporaneous, independently verified data in Defendant AirSafe's possession or reasonably available to it.

136. JCMH relied on Defendant AirSafe's April 9, 2025, System Airflow report, to Dr. Sager's detriment, in declining to repair, replace, or otherwise remediate the known-failing gross room exhaust hood.

**H. The Retaliation**

137. AirSafe's April 9, 2025, formaldehyde badge testing showed a concentration of 33.4 ppm over an exposure time of 0.38 hours in the pathology work area.

138. Dr. Sager and staff raised this result with hospital leadership.

139. An April 7, 2025, meeting again acknowledged the ongoing, unresolved safety issues.

140. As of May 29, 2025, the exhaust hood still had not been replaced.

141. As of May 29, 2025, the only respiratory protective equipment available in the department was a formaldehyde respirator Dr. Sager had purchased herself.

142. Sue McDowell, JCMH's Laboratory Director, had signed off on multiple failed exhaust-hood safety reports dating back to 2023.

143. Hospital administration continuously dismissed these reports.

144. On April 29, 2025, Defendant Hartgraves, on behalf of JCMH, sent the former President of Affiliated, Dr. Kenneth Ford, written notice terminating the Pathology Service Agreement without cause.

145. The termination was effective November 24, 2025.

146. Defendant Hartgraves stated that in-house Pathology service was "no longer financially feasible" due to reagent and supply costs.

147. Defendant Hartgraves stated that reagent and supply costs had "more than tripled" over four years.

148. On April 29, 2025, Defendant Hartgraves and Simmons informed Dr. Sager directly that the department would be closed and outsourced.

149. Defendant Hartgraves and Simmons cited "budget" as the reason for closure.

150. On April 29, 2025, a previously scheduled DCCS consulting engagement (Warren Erickson) began its onsite visit.

151. The DCCS onsite visit began one day after Dr. Sager was told the department would close.

152. The DCCS consultant did not spend any time actually evaluating the pathology department, despite having been specifically engaged to do so.

**I. The "Financial Justification" Was Pretextual**

153. JCMH's stated reason for the closure was tripled reagent and supply costs and financial infeasibility.

154. JCMH's stated reason for closure is contradicted by JCMH's own budget, board, and contract records.

155. Per Dr. Sager's sworn complaint to the Office of Civil Rights, no hiring freeze, attrition, layoffs, or expense discussions occurred before April 29, 2025.

156. A Pathology Services Contribution Margin Analysis presented to the JCMH Board of Trustees on June 17, 2024, showed the department generating a 7.5% positive contribution margin for JCMH.

157. The same analysis shows Medical/Surgical Supply costs of $540,040 in FY2023 versus $545,329 in FY2024.

158. The increase in Medical/Surgical Supply costs from FY2023 to FY2024 was approximately $5,300, not a tripling.

159. The department's only significant year-over-year cost increase was in salaries, which rose from $212,536 for FY2023 to $283,100 for FY2024.

160. The salary increase from FY2023 to FY2024 was consistent with hospital-wide salary increases.

161. JCMH's FY2025 Budget Revenue and Total Expense Summary reflects Pathology inpatient revenue of $258,534, and outpatient revenue of $1,622,946.

162. JCMH's FY2025 Budget Revenue and Total Expense Summary reflects total departmental expenses of $1,049,492.

163. JCMH's FY2025 budgeted departmental expenses of $1,049,492 were essentially flat against FY2024 departmental expenses of $1,056,740.

164. JCMH's FY2025 budget reflected a 0.0% budget variance for the Pathology department.

165. JCMH's FY2025 budget contained no line-item indication that closure or downsizing of the Pathology department was contemplated when the budget was proposed.

166. Total Pathology departmental expenses rose from $979,152 in FY2023 to $1,056,740 in FY2024 to a budgeted $1,049,492 in FY2025, a modest, non-tripling trend.

167. Sue McDowell confirmed there was no written monthly pathology budget.

168. On July 22, 2024, Defendant Hartgraves signed a 5-year Reagent Rental Agreement for the JCMH Laboratory's immunohistochemical strainer with Biocare Medical.

169. The Biocare Medical agreement committed JCMH to a minimum $12,000 per month reagent purchase commitment, plus a $1,995 freight fee.

170. JCMH remains bound for roughly 4.5 years even after the Pathology department's closure, unless cancelled or bought out.

171. JCMH's 2025 Clinical Contract Evaluation Results rated Affiliated Pathologists' pathology services at 4.0 out of 5.0 for overall satisfaction.

172. A 4.0 out of 5.0 rating is above the 3.0 threshold Hartgraves has cited as the point at which contracts are re-evaluated.

173. Upon information and belief, JCMH continued numerous other vendor contracts without disruption despite ratings comparable to or lower than Affiliated's contract.

**J. Sager's Constitutionally Protected Activities**

174. Dr. Sager, together with other pathology staff, reported the exhaust hood failure and elevated formaldehyde levels to JCMH's Corporate Compliance Hotline on or about March 11, 2025.

175. Dr. Sager repeatedly expressed concerns to JCMH supervisors regarding the elevated formalin levels in the pathology gross room between March and July 2025.

176. Dr. Sager made these reports because of the hazardous nature of formalin exposure to laboratory personnel and patients.

177. Dr. Sager's reports concerned a hazard capable of affecting members of the Jackson County community, not merely JCMH's internal operations.

178. On May 29, 2025, Dr. Sager filed an Employment Discrimination Complaint with the Oklahoma Office of Civil Rights expressly alleging that the Pathology Department's closure was retaliation for reporting unresolved OSHA safety violations.

179. On August 1, 2025, Dr. Sager met with an OSHA Compliance Safety and Health Officer in Oklahoma City, Oklahoma to file a complaint against JCMH.

180. Between August 7, 2025, Federal OSHA attempted to inspect the JCMH Laboratory.

181. Defendant Simmons informed the OSHA Investigator that JCMH was a public entity.

182. Because of JCMH's public status, Federal OSHA lacked jurisdiction to inspect the Laboratory.

183. On August 12, 2025, Dr. Sager submitted a PEOSH Complaint to the Oklahoma Department of Labor reporting:

A. Long-term formaldehyde exposure over two times the OSHA PEL with no employee notification;

B. An incorrect respirator cartridge change schedule, causing four months of breakthrough exposure; and

C. JCMH's obstruction of Federal OSHA's investigation.

**K. The Termination Letter and Dr. Sager's Response**

184. On August 13, 2025, Defendant Simmons delivered a letter to Dr. Sager containing allegations against her arising from events of August 8, 2025 and concerning her "accountability" for the Pathology department.

185. That same day, the hospital sent that same letter to Dr. Ford (now deceased), notifying Affiliated of termination of the Pathology Service Agreement.

186. The August 12, 2025, letter alleged that pathology staff and Defendant Simmons arrived on August 8, 2025, to find air quality alarms sounding.

187. The August 12, 2025, letter alleged that formaldehyde was discovered on the counter, tissues, paper, and cabinets in the gross room on August 8, 2025, and that the room was in a state of disarray that Defendants allege appears deliberate.

188. The August 12, 2025, letter alleged that a large number of cardboard slide holders had been stacked under the exhaust vent hood in a manner designed to block the exhaust vent.

189. The August 12, 2025, letter alleged Dr. Sager's "complete lack of accountability" for the state of the pathology department.

190. On August 19, 2025, JCMH Chief of Staff, Lindsey King, M.D., suspended Dr. Sager's clinical privileges.

191. On September 9, 2025, the JCMH reinstated Dr. Sager's clinical privileges, finding no evidence that she caused the formaldehyde spill, while noting other Hospital staff may have been involved.

192. On September 9, 2025, Dr. Sager responded in writing to each allegation in the August 12, 2025, letter.

193. Dr. Sager's September 9, 2025, response stated that the timeline demonstrated no formalin spill occurred before 6:10 a.m. on August 8, 2025, and that any spill giving rise to the elevated alarm activity occurred at or after 6:35 a.m., after Shelley Simmons had already entered the area.

194. Dr. Sager's September 9, 2025, response stated that she left the Gross Room clean and free of formalin or disarray at approximately 7:00 p.m. on August 7, 2025, the evening before the alleged incident.

195. Dr. Sager's September 9, 2025, response stated that she knew OSHA was scheduled to measure formaldehyde levels on August 8, 2025, and that all pathology staff was scheduled to be off that day.

196. Dr. Sager's September 9, 2025, response attached photographs from March, June, and July 2025 documenting chronic, inadequate daily cleaning of the gross room by pathology supervisor Dacia Binghom over a period of months, predating and unrelated to the August 8, 2025 incident.

197. Dr. Sager's September 9, 2025, response stated that the placement of cardboard slide holders under the exhaust vent hood was consistent with the department's longstanding, historical practice, and attached photographs from December 2023, February 2024, and May 2025 documenting that practice.

198. Dr. Sager's September 9, 2025, response stated that she had repeatedly brought compliance issues to the attention of Sue McDowell and Dacia Binghom, and had been told there were no formaldehyde compliance issues.

199. Dr. Sager's September 9, 2025, response demanded that the Hospital investigate and take action regarding the person or persons responsible for the actual formalin spill, and that the hospital fulfill its regulatory requirement to provide written notification to all employees exposed to formaldehyde on or after the April 9–10, 2025 monitoring.

200. Upon information and belief, JCMH took no action.

201. On November 11, 2025, Defendant Hartgraves responded in writing to Dr. Sager's September 9, 2025 letter, stating that JCMH did not find her responses credible.

202. Defendant Hartgraves's November 11, 2025, letter stated that Dr. Sager had continued to deny responsibility for supervision of the clinical and pathology labs, contrary to her duties as Medical Director under the Agreement.

203. Defendant Hartgraves's November 11, 2025, letter stated that, as a consequence, the Agreement terminated September 11, 2025.

204. Defendant Hartgraves's November 11, 2025, letter enclosed a delinquent invoice to Anatomical Medical Laboratories, Inc. for services rendered in connection with Great Plains Regional Medical Center and requested prompt payment.

**L. The Aftermath: Injuries caused by Defendants**

205. As a result of exposure to formalin, Dr. Sager has suffered serious and permanent injuries—physically, emotionally, mentally, and financially. Her impairments and injuries include but are not limited to permanent Eye Hyperosmolarity with Dry Eye Disease.

206. Dr. Sager's symptoms include blurred vision, light sensitivity, inability to focus when looking through a microscope, and persistent eye pain.

207. Dr. Sager had no prior history of this or a related condition.

208. Dr. Sager now requires daily treatment and medications.

209. Dr. Sagers did not perform any work as a pathologist at JCMH after August 13, 2025.

210. Dr. Sager has been unable to perform the gross and microscopic evaluation of anatomic pathology specimens, which comprised 85% of her professional duties, since August 7, 2025.

211. As a direct and proximate result of Defendants' negligent, reckless, willful, and wanton acts and omissions, Dr. Sager suffered and will continue to suffer extreme personal injuries that are set forth more fully in the "Damages" section of this Complaint.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION: FIRST AMENDMENT RETALIATION

***Brought by all Plaintiffs Against Defendants Authority, JCMH HCC, Foundation, Hartgraves, and Simmons***

212. Defendants are, upon information and belief, a public hospital authority or public trust organized under Oklahoma law and/or a governmental subdivision of Jackson County, rendering it a "person" acting under color of state law for purposes of 42 U.S.C. § 1983.

213. The First Amendment to the U.S. Constitution protects individuals and independent contractors from retaliation by governmental entities for protected speech and petitioning activities.

214. Defendants terminated Affiliated's Pathology Service Agreement in retaliation for Dr. Sager's reports concerning the safety violations.

215. Dr. Sager's reports and expressions of concern regarding rising formalin levels in the pathology gross room constituted conduct protected by the First Amendment of the Constitution of the United States.

216. Dr. Sager's reports and expressions of concern regarding formaldehyde levels and ventilation in the pathology gross room constituted protected activity under the First Amendment.

217. Dr. Sager made these reports outside her role as an employee of JCMH; she was not employed by JCMH and provided pathology services through Affiliated.

218. The matters reported by Dr. Sager were matters of significant public concern impacting the safety of JCMH patients and staff, including Dr. Sager.

219. Dr. Sager's interests in speaking about matters of public concern were not outweighed by JCMH's interest in the efficient provision of public hospital services.

220. Defendants violated Dr. Sager's rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States by terminating Affiliated's Agreement with JCMH in retaliation for reporting insufficient ventilation, heightened formalin levels, and improper PPE for employees.

221. The speech at issue did not disrupt the workplace, impede Dr. Sager's ability to do work, or harm the mission of JCMH.

222. JCMH had no evidence of any such disruption or harm when it decided to terminate Plaintiff's contract.

223. As a result of the acts of the individually named defendants, Plaintiffs suffered pecuniary loss, pain, suffering, humiliation, and emotional distress for which she is entitled to recover damages from the individually named defendants.

**SECOND CAUSE OF ACTION: UNCONSTITUTIONAL POLICY, PRACTICE, CUSTOM, OR USAGE**
***Brought by all Plaintiffs Against Defendant Authority***

224. At all material times to this Complaint, Defendant Authority instituted policies, practices, customs, and usages that were the direct and proximate causes of the unconstitutional conduct—retaliation—alleged herein.

225. Defendant Authority is responsible for the development, application, and enforcement of policies, practices, and customs at JCMH.

226. Defendant terminated Affiliated's Agreement with JCMH because Dr. Sager reported safety violations.

227. Dr. Sager's reports and expressions of concern regarding rising formalin levels in the pathology Gross Room constituted conduct protected by the First Amendment of the Constitution of the United States.

228. Dr. Sager reported these concerns as a private citizen.

229. The matters reported by Dr. Sager were matters of significant public concern impacting the safety of JCMH patients and staff, including Dr. Sager.

230. Dr. Sager's interests in speaking about matters of public concern were not outweighed by the interests of Defendant Authority as an employer in promoting the efficiency of the public services it performs through its employees.

231. Other JCMH Laboratory employees also reported concerns about the safety of the JCMH Laboratory to JCMH Corporate Compliance.

232. Other JCMH Laboratory employees also reported concerns about the safety of the JCMH Laboratory to PEOSH.

233. These employees were terminated from employment because of their reports.

234. Termination of the Agreement with Affiliated demonstrates that Defendant's conduct was carried out pursuant to the customs, practices, and policies of Defendant Authority.

235. 42 U.S.C. § 1983 imposes liability on government entities and supervising officials under circumstances that "cause" government employees acting under the color of state law to violate another's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Thus, "when the execution of a government's policy or custom . . . inflicts (an) injury," then "the government as an entity is responsible under § 1983." *Id.* at 694.

236. As a result of the acts of Defendant, Plaintiffs are therefore entitled to damages as more particularly outlined in the section of this Complaint entitled "Damages."

## THIRD CAUSE OF ACTION: NEGLIGENCE

***Brought by all Plaintiffs against Defendant AirSafe individually, vicariously, and severally***

237. Defendant AirSafe held itself out as "The Certified Professionals" and undertook to perform environmental and industrial hygiene testing—including formaldehyde vapor analysis and exhaust/ventilation certification—referencing OSHA standards 29 C.F.R. §§ 1910.1048; 1910.1000, for the benefit of JCMH and its laboratory personnel, including Dr. Sager, who would foreseeably work in and rely on the safety of the tested spaces.

238. Defendant AirSafe owed Dr. Sager, as a foreseeable and identifiable person whose occupational safety depended on the accuracy of Defendant AirSafe's testing and reporting, a duty to exercise reasonable care in performing, calculating, verifying, and reporting the results of its environmental testing.

239. Defendant AirSafe breached that duty by, among other things:

A. Reporting an exposure time of 0.38 hours instead of the actual 24.38-hour sampling period;

B. Issuing and re-issuing a Summary and Recommendations report stating no exceedance of the OSHA formaldehyde PEL had occurred, both before and after Defendant AirSafe was on notice of the error;

C. Failing to calculate or disclose the 8-hour time-weighted average (ultimately 1.6 ppm) despite possessing the corrected underlying data as of June 18, 2025;

D. Failing to respond to repeated specific requests from JCMH laboratory personnel for clarification and correction for three to six weeks; and

E. Certifying gross room exhaust airflow at levels mathematically and factually inconsistent with contemporaneous, independently-measured velocity and smoke-containment failures documented by Advanced 797.

240. As a direct and proximate result of Defendant AirSafe's negligent, reckless, willful, and wanton acts and omissions, Dr. Sager continued to work in and around the gross room without adequate warning, protective measures, or remediation, resulting in the "Damages" section of this Complaint.

## FOURTH CAUSE OF ACTION: FALSE REPRESENTATION

***Brought by all Plaintiffs against Defendant AirSafe individually, vicariously, and severally***

241. Defendant AirSafe made material representations to JCMH and, through JCMH, to Dr. Sager as a foreseeable and intended recipient or user of the information, that:

A. No individual reading exceeded the OSHA time-weighted average of 0.75 ppm for formaldehyde in the gross room; and

B. The gross room ventilation system met the minimum required air changes per hour.

242. Defendant AirSafe's representations were material to whether the gross room was safe for continued occupational use and whether corrective action was required.

243. Defendant AirSafe's representations were false in that Defendant AirSafe's own corrected underlying data, obtained from ACS and in Defendant AirSafe's possession by June 18, 2025, reflected a 24-hour formaldehyde concentration of 0.52 ppm (above the OSHA 0.5 ppm action level) and, once the 8-hour time-weighted average was calculated (Basis 8.00), a level of 1.6 ppm — more than double the OSHA 0.75 ppm PEL that Defendant AirSafe's report represented had not been exceeded. Defendant AirSafe's airflow certification likewise was false in that it

represented compliant ventilation performance contradicted by Advanced 797's two independent, contemporaneous velocity and smoke-containment failures on the same exhaust hood.

244. Defendant AirSafe made and continued to republish these representations either knowing them to be false or as positive assertions made recklessly, without knowledge of their truth. In particular, by May 29, 2025, Beyers acknowledged in writing that the originally reported 0.38-hour exposure time was incorrect and that the true sampling period was approximately 24 hours and 23 minutes; by June 18, 2025, Defendant AirSafe possessed corrected data showing a 24-hour concentration of 0.52 ppm; and by July 2, 2025, the Basis 8.00 calculation of 1.6 ppm had been generated by ACS. Despite this actual or constructive knowledge, Defendant AirSafe never revised its Summary and Recommendations language stating no exceedance had occurred, and on June 20, 2025, Beyers directed Dena Vineyard to contact ACS directly rather than himself disclosing the calculation Defendant AirSafe already had reason to know or obtain.

245. Defendant AirSafe made these representations in certification reports expressly prepared for, and transmitted directly to, JCMH's Plant Operations and Pathology personnel for the purpose of documenting workplace safety compliance, with the intention and reasonable expectation that JCMH and its laboratory staff, including Dr. Sager, would act upon them in deciding whether the gross room was safe for continued use without further protective measures or remediation.

246. Dr. Sager and JCMH in fact relied on Defendant AirSafe's representations of no exceedance and of compliant ventilation, as reflected in JCMH's continued operation of the gross room without corrective action; JCMH's decision to not replace the failing exhaust hood, and JCMH's response to the College of American Pathologists citing Defendant AirSafe's reporting in support of its position that "NO further intervention required."

247. As a direct and proximate result of that reliance, Dr. Sager suffered the injuries and damages described in the "Damages" section of this Complaint, including but not limited to continued unmitigated occupational exposure to elevated formaldehyde vapor levels and consequent physical harm.

## FIFTH CAUSE OF ACTION: PREMISES LIABILITY

***Brought by all Plaintiffs against Hospital Defendants individually, vicariously, and severally***

248. As owners or occupants of the premises, the Hospital Defendants owed invitees on the premises, including Dr. Sager, a duty to exercise reasonable care to keep and maintain the premises in a safe condition.

249. Defendants had a duty to safeguard visitors, including Dr. Sager, from dangerous conditions of which Defendants knew or, through the exercise of reasonable care, should have known could foreseeably lead to an unreasonable risk of harm to those on the premises.

250. Defendants owed invitees, including Dr. Sager, a duty of care to prevent or correct dangerous conditions on the premises that would foreseeably lead to an unreasonable risk of harm to those on the premises.

251. Defendants had a duty to inform visitors on the premises, including Dr. Sager, of latent defects that are not readily apparent.

252. Insufficient ventilation in a laboratory that uses toxic chemicals such as formaldehyde is a condition on the premises that involves an unreasonable risk to Plaintiff.

253. Defendants breached their duties of care to Dr. Sager by their negligent, reckless, willful, and wanton acts and omissions, including but not limited to the following:

A. Failing to maintain a safe laboratory for pathologists;

B. With prior knowledge of the faulty hood, failing to fix the hood fan;

C. With prior knowledge of the faulty hood, failing to provide laboratory staff, including Dr. Sager, with adequate PPE to protect her from formalin exposure;

D. Failing to comply with, or assure compliance, with OSHA PPE and respiratory protection standards;

E. Failing to investigate, intervene, assist, or otherwise warn Dr. Sager about the potential for formalin exposure; and

F. Otherwise failing to act reasonably under the circumstances.

254. As a direct and proximate result of the Defendants' negligent, reckless, willful, and wanton acts and omissions, Dr. Sager suffered and will continue to suffer extreme personal injuries that are set forth more fully in the "Damages" section of this Complaint.

**SIXTH CAUSE OF ACTION: NEGLIGENCE & NEGLIGENCE PER SE**
***Brought by all Plaintiffs against Hospital Defendants individually, vicariously, and severally***

255. In the alternative, and if for any reason the Defendants did not owe Dr. Sager a duty of care by those who owned and controlled the premises at issue, the Defendants are liable for ordinary negligence and negligence per se.

256. The Hospital Defendants owed those working on the premises, including Dr. Sager, a duty to exercise reasonable care under the circumstances.

257. Defendants breached their duties of care to Dr. Sager by their negligent, reckless, willful, and wanton acts and omissions, including but not limited to the ways delineated above.

258. As a direct and proximate result of Defendants' negligent, reckless, willful, and wanton acts and omissions, Dr. Sager suffered and will continue to suffer extreme personal injuries that are set forth more fully in the "Damages" section of this Complaint.

**DAMAGES**

259. As a direct and proximate result of Defendants Authority's, JCMH HCC's, and Foundation's unconstitutional and willful misconduct, and negligent acts and omissions as set forth

herein, Plaintiffs Affiliated and Dr. Sager sustained the following damages in excess of the jurisdictional requirement of this Court:

A. All economic damages available pursuant to 42 U.S.C. §§ 1983 and 1988;

B. All non-economic damages available pursuant to 42 U.S.C. §§ 1983 and 1988;

C. Punitive damages against only Defendants Hartgraves and Simmons named in their individual capacities;

D. Attorney fees and costs for all claims for relief pursuant to 42 U.S.C. §§ 1983 and 1988;

E. Pre-judgment interest; and

F. All allowable costs, expenses, and fees associated with this litigation.

260. As a direct and proximate result of Defendants' negligent, reckless, willful, and wanton acts and omissions, Plaintiffs Affiliated and Dr. Sager are entitled to compensation for the following damages:

A. Past and future physical pain and suffering in an amount to be proven at trial;

B. Past and future emotional pain and suffering in an amount to be proven at trial;

C. Past and future enjoyment of life in an amount to be proven at trial;

D. Past and future disability in an amount to be proven at trial;

E. Future loss of income and earning capacity in an amount to be proven at trial;

F. Past and future medical and related expenses in an amount to be proven at trial;

G. Past and future caretaking in an amount to be proven at trial;

H. Past and future disfigurement in an amount to be proven at trial;

I. Other past and future pecuniary loss in an amount to be proven at trial;

J. Punitive damages;

K. All allowable costs, expenses, and fees associated with this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Rebecca Sager, M.D. and Affiliated Pathologists, P.A., pray that the Court enter judgment against Defendants, jointly and severally, in an amount supported by the allegations of this Complaint, as follows:

I. Judgment against Defendants, jointly and severally, for general damages in an amount consistent with the allegations contained herein and to be proven at trial;

II. Judgment against Defendants, jointly and severally, for special damages in a reasonable sum but not less than seventy-five thousand dollars consistent with the allegations contained herein and to be proven at trial;

III. Judgment for punitive damages against Defendants Hartgraves and Simmons individually in an amount to be determined by the triers of fact;

IV. An award of attorney fees and costs for all claims for relief within the Complaint pursuant to 42 U.S.C. §§ 1983 and 1988;

V. Judgment against Defendants for general damages in an amount consistent with the allegations of this Complaint and to be proven at trial;

VI. Judgment against Defendants for special damages in an amount consistent with the allegations of this Complaint and to be proven at trial;

VII. Judgment against Defendants for punitive damages; and

VIII. Judgment for costs, interests, and such other and further relief as the Court deems just and equitable.

Respectfully submitted,

/s/ *Peter L. Scimeca*

Peter L. Scimeca, OBA #21805
FELLERS, SNIDER, BLANKENSHIP,
BAILEY & TIPPENS, P.C.
100 N. Broadway, Suite 1700
Oklahoma City, OK 73102
Telephone: (405) 232-0621
Facsimile: (405) 232-9659
pscimeca@fellerssnider.com
***ATTORNEYS FOR PLAINTIFF***